May it please the Court, Sean O'Keefe appearing on behalf of Winthrop Couchot. I'm going to attempt to reserve five minutes for my rebuttal. In the last page of the opinion, the lower court states that the Monaco defendants woefully and in bad faith withheld relevant documents from the Trust in violation of Rules 26A and C. A paragraph and a half later, the Court concludes that on that basis, sanctions should be awarded under Rule 37C against both the Monaco defendants and Winthrop Couchot. We've already addressed in the papers our contention that 37C does not allow sanctions against the firm. However, there is a more fundamental issue here, and it is a common defect throughout the opinion. And that is the assumption, the complete lack of findings, never mind the explicit findings that this Court requires under the primus auto finance, establishing that Winthrop Couchot, through act or knowledge, Winthrop Couchot, not the Monaco defendants, either did something or knew something that would create a contention, an explicit finding of bad faith. There's nothing in the record. There's nothing in the record. And the assumption throughout the opinion is that Winthrop Couchot knew something more than what its client testified to. If you look at the record here, well, my understanding, counsel, is that on these document production requests, that documents were not produced, a fairly large volume of documents were not produced. The, give me the names of the individuals again.  Monacos. The understanding was that they then took the position that he had some documents in his garage, but he had turned over to the buyer of the property other documents which were a substantial volume. And then his deposition is taken. He says, no, I don't have them. They're over someplace else. And meanwhile, the law firm is continuing to say, you know, we don't have them. We don't have them. It's maintaining a position of lack of possession, lack of control, even after the evidence is coming out that, assuming that the law firm didn't have reason to suspect the original representations to the court were untrue, at some point he became aware of them, and yet continued to take the position of lack of knowledge, lack of ability to produce. With that, Your Honor has identified the only reference, the only reference in the totality of the opinion which imputes wrongdoing specifically to something that Winthrop Couchot did, and there is an explanation for that. What happened in this case was the client was directed repeatedly to produce any and all responsive documents, and to the knowledge of Winthrop Couchot, he did so. Now, in connection with this, he testified under penalty of perjury that he had produced all the documents and that the only documents that he didn't have were those that he had transferred to Mr. Fogg after he sold his interests in the LLCs 18 months before they filed a complaint. Now, we verified with Mr. Fogg that, in fact, those interests were sold, and we also had our client testify to that fact under penalty of perjury. Okay, but let me just back up and be specific. On March 11, Fogg's deposition, he says he does not possess the books and records and that those records were in the position of Tom Cooley, the Monaco's accountant. On April 8, the Winthrop letter insists all documents were transferred to Fogg. The same repeated on May 11. All documents were transferred to Fogg. The client was queried, and he insisted that they were given to Fogg. Well, wait a minute. Are you the counsel? Winthrop-Pouchot, yes. Okay, Winthrop-Pouchot, and there's a deposition in which Winthrop-Pouchot is present, and Fogg denies that he's got them. They're in the possession of the accountant. It seems to me the counsel would immediately be talking to Cooley, the accountant. We did. We did. In fact, there was we went to Mr. Cooley. We'd already gone to Mr. Cooley, and he had produced everything that he contended he had in his possession of control. We also directed the client, after we became aware of this conflict in testimony between our client and Mr. Fogg, to go to Mr. Fogg again. Mr. Fogg then admitted, after he went through his own documents again, and there was a declaration by Mr. Fogg that we submitted. I think it's in Volume 5 of the excerpts of record. In that declaration, Mr. Fogg admits that, in fact, he was wrong. He did have all the corporate checks. So when Anthony Monaco testified on the record, I gave those documents to Mr. Fogg, in fact, Mr. Fogg has admitted that he received those. That is the evidence before this Court today. Well, didn't in August of 2009, Monaco said he had 50 boxes of documents and two computer servers, none of which he had given to Fogg. That's exactly right, and if you read his testimony, we state in our brief that when we attended that deposition, which was two days before the expiration of the discovery quarter cutoff on August 28th, that's the first time that we heard of those documents as well. Well, you know, counsel, when you're under a mandate, your client's under a mandate to produce documents, and you're getting conflicting evidence through all of this discovery leading, you know, predating August, I'm having a little trouble understanding how Monaco can wind up with 50 boxes and two computer servers. He's your client, right, and you're saying you all weren't going after him and finding that there are all these inconsistencies, Fogg doesn't have them, you know, that Cooley doesn't have them. Who's got them? Well, let's take them in pieces. The computer servers were disclosed in an e-mail, counsel. The computer servers were queried by a professional, and all documents thereon were produced. The difficulty, the reason why it took several months to do that was there were five or six-year-old machines. They were in somebody's garage. The client was financially challenged. We had to coerce him to hire an expert out of his own pocket, which he didn't want to do, to query those machines. Those documents were produced. So that's totally separate. There was complete compliance there. Now, we're talking about the five or six boxes that the client represented he transferred to Mr. Fogg. That was his testimony for an entire year. When we became aware as to those five or six boxes that Mr. Fogg was saying, no, I didn't get them, we went back to the client, and when you have two witnesses, your witness, saying, I gave them to him, and the other witness says he didn't, as an attorney, absent objective evidence to the contrary, you are required to rely on the testimony of your client. But we did more than that. We had him reach out to Mr. Fogg, which Mr. Fogg testifies to in his declaration in support of the motion for reconsideration. Mr. Fogg says, Mr. Monaco contacted me again. I did what I should have done in the first place, which is walk into my garage and see if they were there, and, in fact, they were there. That's his testimony. He has all the checks with respect to the entities. That's the five or six boxes. So that's Category 2. Now, that just leaves the 50 boxes. If you read the client's testimony, the client testified, I don't view those documents as the documents of the development entities because they are house plans, infrastructure blueprints, lot line documents. Those are my construction defect files. So that's why when I referred to, quote, the majority of the documents being transferred over to Mr. Fogg, I wasn't referring to those 50 because, in his mind, those were his documents. But the relevant fact before the district court is, did he comply with counsel's direction to go through those documents and produce all responsive documents? The testimony is that he did that. Did he produce every single document in those, which would be basically nothing, because we're talking about blueprints, gutter, sewers, streets, you know, lighting for houses. This had nothing to do with it, and there was no request in the record for anything that would encompass that. But the relevant thing is not the fact that we were unaware of it, and we were unaware of it. Counsel became aware of it, the trust counsel, at the same time we did. What counsel heard was the explanation from our client, as did we. What counsel heard was, those are project files, blueprints, house plans. They're not responsive. I went through those, and I went through them with Mr. Cooley. Now, at the end of that deposition, counsel could have turned to Winter Peauceau and said, I want an extension of the discovery period, or I don't believe him, and I independently want to go through those documents. Nothing. There was no request or suggestion that that explanation was anything untoward. Okay. Why don't you save the balance of your time, and we'll see what the other side has to say. Thank you, Your Honor. May it please the Court. Andrea Kim on behalf of the USACM Liquidating Trust and Appellant. I want to address the core of the issue here, I believe, and which was brought out by Mr. O'Keefe and was brought out by Mr. O'Keefe in the two previous arguments, both before the district court and the bankruptcy court. And here's the core. We are perverting the record a bit by hindsight as opposed to taking it in the chronological order. What happened here was that these requests and documents were back in December of 2008. We were asked to give extra time for the Monacos to produce them. We gave them extra time. We got a smattering of almost nothing. On the face of that production right there, they were not giving us documents they clearly, by the law, under Legato, had custom control of, including their own tax returns, their own bank statements. Counsel, there is a difference between the fault of the clients in failing to produce and the fault of the attorneys, which I think was being argued. Yes, Your Honor. May I address that? Thank you, Judge Ruud. The issue here is that from that point forward, what happened was that we had seven different productions from counsel, okay, seven different ones, December, February, April, March, April, May, June, July, and August, up until two weeks before the motion to compel before the Bankruptcy Court, which I think is the most relevant one here. And counsel, all the way along, said, no, no custody and control. We don't have them. We don't have them. Even two weeks before that hearing, Judge Ruud, counsel was saying, he produced them to me. Counsel, wait a minute. As Judge Ruud pointed out, the question is, these sanctions are imposed against both the client and the firm, so you heard counsel's argument. They, unless there's evidence of bad faith, if they in good faith represent the representations they were making all of this time were based on their reasonable knowledge, then you may have gotten sanctions against the Monacos, but the question before us is getting another $25,000 from the law firm. Yes, Your Honor. I'm sorry, I'm not getting to it. Keep your focus on that. I'm not getting to it quickly enough, obviously. Well, first, I'd address that in two points. First, we don't have to show bad faith in order to get sanctions under Rule 37. Let's assume you can't get them under Rule 37. You also asked for them under inherent power, and if we were to go that direction, you'd have to have bad faith. Yes, Your Honor. So let me address the points of bad faith. Counsel knew about the servers that we've been talking about this whole time all along, okay? And in December, the notice or disclosure that counsel's talking about is an offhanded comment in an e-mail back and forth between his associate and one of my partners in which they were asking for more time, and they said we're having some difficulty accessing his servers. Never did they disclose that in their Rule 26 disclosures, and never did they say those are company documents or they contain company documents. To the contrary, despite the fact that counsel was aware of those servers from day one and knew that they contained potentially relevant documents all about company documents, they continued to say no custody control, no custody control, no custody control. So then, and this is the key, they're talking today about how, well, I relied on an expert. Okay? To tell me. And I relied on the client. But that rings hollow because the expert they're talking about didn't even come into the picture. There wasn't even a declaration until a year later in December of 2009. In front of the bankruptcy court, Judge Regal, we had a full hearing on a motion to compel. Never was it raised that these servers contained this information, that they had done any due diligence and that the servers were part of the company documents that they had custody and control. Counsel, sitting here before you today, represented the bankruptcy court, and I direct the court to excerpts of record 001747 through 85, which is the bankruptcy record of the discussion and the argument. He told the bankruptcy court they don't have any custody and control because, one, they sold the company for a dollar to Mr. Fogg, and, two, because nanny nanny boo boo, I'm not the managing partner. Counsel, this is a dignified proceeding. We don't need nanny nanny. I understand. I understand, Your Honor. Take it down a notch. This is not a trial court. I understand, Your Honor. The issue before the bankruptcy court was whether or not those servers contained some information that would be relevant, responsive, because after nine months of trying, they hadn't produced anything. And counsel made the representation that, no, there are no documents. We don't have them, not because we've looked and we've been diligent, and we have them in our custody and control, and we've looked and been diligent, and they're not there. No. Rather, counsel said we have no custody and control. On the basis of that, the trust went out to discover against Mr. Fogg and Mr. Fooley and had subpoenas and went chasing around in a wild goose chase trying to find exactly who had the company documents, who had the documents for all these developments that produced over $60 million worth of profits, because there was a huge commingling of those monies in such a way that we were following the cash from a fraud and a Ponzi scheme to find the cash. And counsel made the representation, not that, hey, we had servers and we looked at it, but rather, no, we don't have custody and control because we made the sale. Now, after that hearing, what the bankruptcy court ruled, and this is important, the bankruptcy court said, I can't rule here because I think you need to depose Mr. Monaco to have him under oath that he really doesn't have custody and control. It's not just the evidence we had. And we had before that court Exhibit Q to the Roberts Declaration, which was before that bankruptcy court and was also before the district court, we had documents that had been produced over those seven months that I discussed with the court a moment ago that had access dates. You know, when you pull down an e-mail and you describe to the court, it has a date at which you pull down that e-mail that were well after the sale, the $1 sale to Mr. Fogg. And these were pieces of evidence we were showing to the court, we were showing to opposing counsel. We were saying, this indicates that, in fact, he does have access and control. And they maintained, no, we don't have access and control. And they kept and they maintained that all the way through. Then when we took Mr. Monaco's deposition, and he didn't try to dissemble or hide it. We simply asked and we said, do you have company documents? And he said, yes, I have. We have these 50 boxes in a warehouse. It defies logic. And before the district court, the district court had this record before him in which he said, well, if the trust asked him on deposition and he said, yeah, he has them, certainly the court was entitled, and it is not error, to say, well, why didn't their counsel ask him the same question? And what's important here is the point at which that happened was only a matter of days into the end of the discovery. And he's talking about 50 boxes in a warehouse, and he's still maintaining that I have no custody and control over documents, over company documents. So the trust is placed in a dilemma. It couldn't do anything, the trust couldn't do anything about that at that point because the bankruptcy court secondly said, I want you to complete the record, but I'm denying it without prejudice. I am going to remove the reference, move to remove the reference to the district court because I think this issue of non-production is so substantive, it has such a substantive effect on the actual merits of the matter that the district court needs to deal with it. So it sent it down to the district court, and we had to wait until the district court agreed to remove the reference. And as soon as they did, as soon as they did, we refiled exactly as we said to the bankruptcy court that we would do and exactly as counsel was aware we would do, we refiled the same motion to compel to say, okay, well, now everything that we've said, all the evidence we've had and everything we've had in incomplete production, it has been vindicated. And moreover, we now find out that there's these 50 boxes out here somewhere, but they're still maintaining they don't have any custody and control of the documents. So are we to believe that there's no custody and control, or are we to believe that they're actually there and they're not producing them because they've either been, you know, destroyed or they're somehow irrelevant? And we're at the end of discovery at this point. We spent 10 months trying to get production, having counsel not – it wasn't the client that came up with the argument that it's out of our custody and control because we're legally not the managing member, or it's out of our custody and control because, you know, we sold the company for a dollar. Those were legal arguments proposed by counsel. And Mr. Monaco didn't say any of that in the deposition. So that is counsel's representation. So in addition to the – Let me just ask. Yes, Your Honor. Where in the record is all of that summarized and stated by the district court rather than by you? Okay. I would say – I would answer it two ways. One, the district court had before it the bankruptcy transcripts of everything I've just said and all of the evidence that I've just laid out for the court, which I – I understand. I agree with you. I don't think you misrepresented the record. I'm just wondering where it is where the bankruptcy court said all of that. Because the bankruptcy court just simply, to my recollection more or less – I'm sorry, the district court more or less just simply said that he was finding bad faith and didn't really say that much more about it. And I was just wondering if – I missed it. He said a lot more about it and I just didn't find it in the record. Well, the premise of his order, he had several pages actually in his order about what the basis of the bad faith was. And in fact – and I'll point the court to those specifically. Are you talking about the reconsideration or are you talking about the original? I'm talking about the district court.  I'm talking about the district court order. All right. I'm sorry. He – that counsel claimed no possession, custody or control documents that actually turned out to be in their possession, that counsel promised comprehensive responses but didn't get them, that they failed to respond to a letter that we sent early on for a month, that they kept claiming Mr. Fogg had the documents even when he said he didn't, and for that matter, not just claiming that he didn't, which is perhaps a facially problem because Mr. Fogg may be even wrong, but rather because they were saying it wasn't because he physically didn't have them. They were saying it's because of the legal argument that we sold it for a dollar. That was the argument that was being proffered. That they claimed – Let me stop you. Let me just go to a slightly different issue. Yes, Your Honor. The appellee is conceding that there was no order that was issued that was violent. There was no actual discovery order that was the basis of the sanctions. Is that correct? No, Your Honor. We are not. Okay. And also, are you conceding that the appellees cannot go under alleged violation of 26A and E because that would make it fall within Rule 37C? And this circuit hasn't ruled, but other circuits have basically said that 37E does not – is not applicable for attorneys' fees against attorneys. Your Honor, certainly we would say that it has not been ruled in the Ninth Circuit, and so for that reason, it's open for this Court's interpretation. Are you asking for us to make that ruling? Your Honor, you know, to be honest, I don't see in the text of the rule anything that dictates that it's only against parties. It talks about the party's conduct, but it doesn't necessarily address the attorney's conduct. However, I believe that under 37B, there's a discovery order. And in fact, I'll point the Court to the specific statement that the Bankruptcy Court made in its ruling that was before the district court in which it said an order has – they are already under an order to produce. What's the order? It's a case management order, isn't it? It is. The Rule 26 order, sometimes referred to as a case management order. But that would make it fall within 37C, not 37B. I'm not sure that's right, Your Honor. I think that the Bankruptcy Court found in her findings that they were under an order to produce, and for that reason, the district court reading that order said – Let me stop you. Now, if you are going not under those, but if you're going under the court's inherent power, isn't there precedent in this circuit which basically says that if you're going to use the court's – the district court's going to use its inherent power, it has to specifically reference that and not go on a, you know, another rule. And here, to my knowledge, the district court didn't really say that it was using its inherent power in this particular sanctioned order. It's true that he didn't specifically reference that he was using his inherent power. That's absolutely right. Okay. So isn't there – there's this case, the Grid Systems v. John Fluke, which also relies on the Henry-Yagnon case, that says, you know, the conduct in question – I'm sorry – the conduct in question must, in fact, be sanctionable under the authority relied upon. So therefore, if the district court doesn't indicate that it's relying on its inherent power, we cannot utilize that as a justification at this point in time. I think a ruling of that, respectfully, Your Honor, would mean that any time a district court didn't specifically say, I have inherently – inherently have power, that that when the inherent power, I think, is assumed. Well, it's not the existence of the power. It's the use of the power, not the – I agree with you on the point you just made. But I think the rule, at least in the Grid case – although, I will concede that there is another case out there from this circuit also that seems to go the other way. So we'd have to resolve that conflict. Yes, Your Honor. And I guess the problem is that to do that here would be to take something where the record – the record would not have the judge in the district court be found to have been clearly erroneous in his decision or abused his discretion. But why did the – there was a bad faith finding. What was the bad faith finding relevant to? Well, and that's why – that was an enumeration I was just giving. But I think that the bad faith finding was that the counsel continued to maintain there's – But what was it relevant to, not what was it based on? Why did the court – is there a requirement? He went under Rule – explicitly under Rule 37. But that doesn't require bad faith, does it? Yeah. I think you're – the judge is correct. And the point being that I think that is an indication that he was taking advantage of the court's inherent power, although perhaps not explicitly stating so. I see that my time is up. If I don't have any other questions. Thank you. Let me deal with the custody and control issue because we're mixing apples and oranges. What they were asking us to do was to demand as a member from banks, you produce the development entity's checks. That's what we couldn't do. The client had already testified on the penalty of perjury. I am not a member. Eighteen months ago – Are you saying that this is a pinpoint discovery request that says we want checks or is it – That's what – Your Honor, that's what they wanted us to do. And that's what – Let me finish my question. Yes, Your Honor. I mean, I litigated cases like this for 35 years. So none of us on this bench is a stranger to discovery disputes. Okay? None of us. Gone through them, been there, done it. Okay. So what I'm trying to understand is the posture of this case. I'm totally familiar with counsel who are battling back and forth on all the permutations. What I'm trying, in your interest, to find out is what was the outstanding request, be it under the Rule 26 order – apparently that's the only discovery-related order – and what was the nature of their request? Did they say, we want all checks that were written between A and B? Or did they say, we want any documents that are related to these transactions or what? What was it? Your Honor, my recollection is on page 81 of the excerpts of record. Actually, the way they framed their Rule 34 responses, every single reference, they – The trust. The responses? I'm sorry. Their requests referred to relations between the defendants in USAIP, the defendants in USACM, and the defendants in Hanschies and Malinowski. If you go through those, there wasn't a reference to the development entities. Now, in their letters, they communicated to us what they were after. They wanted the accounting records for the development entities, and they wanted the checks of the development entities. Okay. Those are two categories. And the accounting records, were there accounting records on the computer servers? Every record. Were there accounting records on the computer servers? To our knowledge, no. Okay. Were there checks, copies of checks? To our knowledge, no. Okay. Were there, in any of the boxes, were there either checks or accounting records? He had very incomplete parts and pieces of things, because the development's been closed approximately three months. The answer is yes. There were some in there. Yes. And they were all produced. Everything was produced on the servers as well. Counsel mentioned that the access dates were after the sale. The sale occurred in the... I'm sorry. These were all produced when? After Mr. Monaco revealed that he had them in his garage? No, Your Honor. It was in this series of productions as we were obtaining the documents by pressing the client continually because of their demand, not just his documents, but we said to him, look, even though technically you might not have to go to Mr. Cooley's office, go there. And he went there, and he obtained Mr. Cooley's documents. And we went through the same... Just to boil it down, in the documents that Monaco reveals are in the warehouse, at his deposition, were any of those documents, anything in those boxes responsive to the document request by the trust? No. No. And that was put before the district court? That's exactly right. In fact, we went through each and every discovery request. Okay. Thank you. I think we have your... Thank you, Your Honor. All right. Thank you, counsel. The case argued is submitted. And we'll stand in recess or adjournment.
judges: Wu, Fisher, Rawlinson